**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Commodity Futures Trading Commission, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| HDR Global Trading Limited, 100x Holdings Limited, ABS Global Trading Limited, Shine Effort Inc Limited, HDR Global Services (Bermuda) Limited, Arthur Hayes, Ben Peter Delo, and Samuel Reed | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**CIVIL ACTION NO: 20-cv-8132**

**Hon._____**

**Jury Trial Demanded**

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND**
**CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT**
**AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), an

independent federal agency, for its Complaint against Defendants HDR Global Trading Limited

("HDR"), 100x Holdings Limited ("100x"), ABS Global Trading Limited ("ABS"), Shine Effort

Inc Limited ("Shine"), and HDR Global Services (Bermuda) Limited ("HDR Services"), all

doing business as "BitMEX," as well as BitMEX's co-founders Arthur Hayes ("Hayes"),

Benjamin Delo ("Delo"), and Samuel Reed ("Reed") (collectively, "Defendants" or "BitMEX"),

alleges as follows:

## I.    SUMMARY

1.      BitMEX touts itself as the world's largest cryptocurrency derivatives platform in

the world with billions of dollars' worth of trading each day.  Much of this trading volume and

its profitability derives from its extensive access to United States markets and customers.

1

Nevertheless, BitMEX has never been registered with the CFTC in any capacity and has not complied with the laws and regulations that are essential to the integrity and vitality of the U.S. markets, like know-your-customer procedures to prevent money laundering, or procedures designed to detect and prevent manipulative trading and other illicit activities.  Instead, BitMEX has profited while illegally offering leveraged retail commodity transactions, futures, options and swaps; operating as an unregistered futures commission merchant ("FCM"); and operating a facility for the trading of swaps without being registered as a swap execution facility ("SEF") or as a designated contract market ("DCM").  Therefore, the CFTC brings this action against Defendants, the owners and operators of the BitMEX virtual currency derivatives trading platform, to enjoin their ongoing illegal offering of commodity derivatives to U.S. persons, their acceptance of funds to margin derivatives transactions from individuals and entities in the U.S., and their operation of a derivatives trading platform in the U.S. in violation of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1-26 (2018), and the CFTC Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2019).

2.     Beginning no later than November 2014 and continuing to the present (the "Relevant Period"), Defendants have offered commodity futures, options, and swaps on digital assets, including bitcoin, ether, and litecoin, to persons in the United States, from offices in the United States, through the website www.bitmex.com and a mobile application, without registering as an FCM or being designated or registered as a contract market (a DCM) by the Commission.  Defendants also have operated a facility for the trading or processing of swaps without being registered as a DCM or a SEF.

3.     During the Relevant Period, BitMEX has conducted trillions of dollars in digital asset derivatives transactions and earned fees worth more than $1 billion from transactions on its

platform.  BitMEX operated its trading platform in large part from the United States, and engaged in transactions with thousands of U.S. persons.  BitMEX accepted bitcoin deposits worth more than $11 billion from at least 85,000 user accounts with a U.S. nexus.

4.     Throughout the Relevant Period, and through the operation of the BitMEX platform, Defendants have violated, and continue to violate, core provisions of the CEA and Regulations, including:

     i.    offering, entering into, confirming the execution of, or otherwise dealing in, off-exchange commodity futures transactions, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a) (2018), or, alternatively, Section 4(b), 7 U.S.C. § 4(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2019);

    ii.    offering, entering into, confirming the execution of, or transacting in off-exchange transactions in commodity options, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019);

    iii.    acting as an unregistered FCM, in violation of Section 4d of the Act, 7 U.S.C. § 6d (2018);

    iv.    operating a facility for the trading or processing of swaps without being registered as a SEF or as a DCM, in violation of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019);

    v.    failing to supervise, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2019); and

    vi.    failing to comply with applicable provisions of the Bank Secrecy Act, in violation of Regulation 42.2, 17 C.F.R. § 42.2 (2019).

5.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

6.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

8.      Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in the Southern District of New York, and Defendants engaged in acts and practices in violation of the CEA and Regulations within this District.

### III.    PARTIES

#### A.    The CFTC

9.      Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder.

#### B.    Defendants

10.      **HDR Global Trading Limited** was incorporated in the Seychelles in 2014 as a Seychelles International Business Company.  Throughout the Relevant Period, HDR has owned and operated the BitMEX trading platform.  Despite being incorporated in the Seychelles, HDR does not have, and never has had, any operations or employees in the Seychelles.  HDR operates, or has operated during the Relevant Period, out of various locations and offices throughout the world, including in New York, San Francisco, Milwaukee, Hong Kong, Singapore, and Bermuda.  "HDR" derives from the first letter of the last names of Hayes, Delo, and Reed, who are the three primary ultimate owners of HDR and its various subsidiaries, each holding approximately a one-third ownership interest in HDR.

11.      **100x Holdings Limited** is a holding company recently incorporated by Hayes, Delo, and Reed in Bermuda.  In a July 15, 2020, blog post on the BitMEX website, Hayes "introduced" 100x and represented that "100x will become the new holding structure for HDR Global Trading and all our other assets, including the BitMEX platform."

12.      **ABS Global Trading Limited** is a Delaware limited liability company incorporated in 2017 through which BitMEX conducts some operations in the United States.  It is a subsidiary of HDR and 100x, and it is ultimately owned and controlled by Hayes, Delo, and Reed.  "ABS" derives from the first letters of the first names of Hayes, Delo, and Reed:  Arthur, Ben and Sam.

13.     **Shine Effort Inc Limited** is a Hong Kong corporation incorporated in 2014, and a subsidiary of HDR and 100x.  Shine is the corporate entity through which BitMEX conducts proprietary trading on its own BitMEX platform, as well as proprietary trading with other market participants on exchanges and over the counter throughout the world.  Shine is controlled by Hayes, Delo, and Reed.

14.     **HDR Global Services (Bermuda) Limited** is a Bermudian entity incorporated in 2018 that employs certain personnel performing duties for BitMEX.

15.     HDR, 100x, ABS, Shine, and HDR Services act as a single, integrated common enterprise.  They share common office space, employees and operational resources.  They advertise on a single website that does not distinguish between entities.  They share common directors.  They share common ownership.  They share common legal and compliance resources. They share operating expenses, and report financial activities in consolidated financial statements.  BitMEX employees and executives refer to a BitMEX enterprise as opposed to distinguishing between legal entities.  Employees of the various entities have "bitmex.com" email addresses.  These entities operate as an integrated, common enterprise, and are described together in this complaint as "BitMEX."

16.     **Arthur Hayes** is a co-founder and co-owner of BitMEX, and describes himself as Chief Executive Officer of BitMEX.  He is a U.S. citizen who currently resides in Hong Kong. Hayes owns property in the U.S., and files U.S. income tax returns.  During the Relevant Period, Hayes held his ownership interest in the BitMEX entities through a Delaware limited liability company that maintains bank accounts at financial institutions in the U.S. and owns property in the U.S.  Hayes also owns and operates an entity named Headline Asia, through which he conducts transactions with and on the BitMEX platform, and with other cryptocurrency

exchanges and over-the-counter trading partners.  He has never been registered with the Commission in any capacity.

17.    **Ben Peter Delo** is a co-founder and co-owner of BitMEX, and during the Relevant Period he has been the Chief Operating Officer of BitMEX.  He is a U.K. citizen and, on information and belief, currently resides in Hong Kong.  He has never been registered with the Commission in any capacity.

18.    **Samuel Reed** is a co-founder and co-owner of BitMEX, and describes himself as Chief Technology Officer of BitMEX.  He is a U.S. citizen and has resided in Milwaukee, Wisconsin and Boston, Massachusetts during the Relevant Period.  During the Relevant Period, Reed has held his ownership interest in the BitMEX entities through a Wisconsin limited liability company that maintains bank accounts at banks in the United States, and owns property in the U.S.  Reed has never been registered with the Commission in any capacity.

19.    Hayes, Delo, and Reed together control the operations of the BitMEX enterprise.

## IV.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

20.    The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5 (2018).

21.     Derivatives are financial instruments such as futures, options or swaps that derive their value from something else, like a benchmark or a physical commodity.  The CEA requires that, subject to certain exemptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.  For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade, Section 4 of the Act, 7 U.S.C. § 6 (2018), and Regulation 48.3, 17 C.F.R. § 48.3 (2019); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market, 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(a) (2018), and Regulation 37.3, 17 C.F.R. § 37.3 (2019); commodity options must likewise be conducted on a board of trade designated as a contract market, Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019).

22.     A cryptocurrency or virtual currency is a type of digital asset defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction.

23.     Bitcoin, ether, litecoin, and other virtual currencies are distinct from "real" or "fiat" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.  Digital assets, such as bitcoin, ether, and litecoin are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018).

24.     In recent years, as digital asset and virtual currency markets have evolved, the CFTC has approved the offer of futures contracts on virtual currencies by boards of trade

registered with the CFTC such as the Chicago Mercantile Exchange and Chicago Board Options Exchange.

25.     With limited exceptions, Section 5h(a) of the Act,7 U.S.C. § 7b-3 (2018), and Regulation 37.3, 17 C.F.R. § 37.3 (2019), make it illegal for a person to operate a facility for the trading or processing of swaps unless the facility is registered as a designated contract market or a swap execution facility with the CFTC.

26.     Section 1a(47)(A)(iii) and (vi) of the Act, 7 U.S.C. § 1a(47)(A)(iii), (vi) (2018), broadly defines "swap" to include "any agreement, contract, or transaction"—

> (iii) [T]hat provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interest or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract or transaction commonly known as . . . (I) an interest rate swap; . . . (VII) a currency swap; . . . (XXII) a commodity swap . . . [or]

> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

27.     The provisions of the Act and Regulations that apply to DCMs and SEFs, the facilities where the trading of commodity derivatives typically occurs, establish important protections for United States derivatives markets and market participants.  For example, DCMs and SEFs must conform to core principles that are designed to achieve the prevention of market abuse, Sections 5(d)(12)(a) and 5h(f)(2)(B) of the Act, 7 U.S.C. §§ 7(d)(12)(a),  7b-3(f)(2)(B) (2018); ensure their financial stability, Sections 5(d)(21) and 5h(f)(13) of the Act, 7 U.S.C. §§ 7(d)(21), 7b-3(f)(13) (2018); protect their information security, Regulations 38.1051(a)(2)

and 37.1401(a)(2), 17 C.F.R. §§ 38.1051(a)(2), 37.1401(a)(2) (2019); and safeguard their

systems in the event of a disaster, Regulations 38.1051(a)(3) and 37.1401(a)(3), 17 C.F.R.

§§ 38.1051(a)(3), 37.1401(a)(3) (2019).  Further, DCMs and SEFS must ensure that the contracts

they list for trading are "not readily susceptible to manipulation," Sections 5(d)(3) and 5h(f)(3)

of the Act, 7 U.S.C. §§ 7(d)(3), 7b-3(f)(3) (2018); DCMs must "prevent market disruption,"

Section 5(d)(4) of the Act,7 U.S.C. § 7(d)(4) (2018), and SEFs must monitor trading "to prevent

manipulation, price distortion, and disruptions," Section 5h(f)(4)(B) of the Act, 7 U.S.C. § 7b-

3(f)(4)(B) (2018); DCMs and SEFs must impose position limits designed to reduce the potential

threat of market manipulation or congestion, Sections 5(d)(5) and 5h(f)(6) of the Act, 7 U.S.C.

§§ 7(d)(5), 7b-3 (f)(6) (2018); DCMs and SEFs must establish and enforce rules to minimize

conflicts of interest, Sections 5(d)(16) and 5h(f)(12) of the Act,7 U.S.C. §§ 7(d)(16), 7b-3(f)(12)

(2018); and DCMs and SEFs must maintain and retain important records and provide them to the

Commission, Sections 5(d)(18) and 5h(f)(10) of the Act, 7 U.S.C. §§ 7(d)(18), 7b-3(f)(10)

(2018).

28.     An FCM is an individual, association, partnership, corporation, or trust that is (i)

engaged in soliciting or in accepting orders for regulated transactions including futures, swaps,

commodity options, or retail commodity transactions, or (ii) acts as a counterparty to retail

commodity transactions; and which, in connection with these activities, "accepts any money,

securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any

trades or contracts that result or may result therefrom."  Section la(28)(A) of the Act, 7 U.S.C.

§ la(28)(A) (2018).

29.     Retail commodity transactions are transactions that are entered into with, or

offered to, non-eligible contract participants "on a leveraged or margined basis, or financed by

the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis."  Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2018).  Retail commodity transactions are subject to Section 4(a) of the Act, 7 U.S.C. §§ 6(a) (2018), "as if" they are a contract of sale of a commodity for future deliver, and therefore must be executed on a regulated exchange.

30.     An eligible contract participant ("ECP") is, in general, an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million, or $5 million if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."  Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi) (2018).

31.     FCM's hold customer funds to margin commodity derivative transactions.  They are a critical component of the U.S. financial system, and therefore must meet stringent requirements imposed by the Act and Regulations.  Among the most fundamental of these requirements is Section 4d(a) of the Act, 7 U.S.C. § 6d(a) (2018), which makes it illegal for any person to be an FCM unless registered as such with the Commission.  FCMs must establish safeguards to prevent conflicts of interest, Section 4d(c) of the Act, 7 U.S.C. § 6d(c) (2018); segregate customer assets to protect them from the risk of the FCM's insolvency, 7 U.S.C. § 6d(a)(2); and employ only salespeople who register with the CFTC and meet strict proficiency requirements, Section 4k(1) of the Act, 7 U.S.C. § 6k(1) (2018).

32.     Regulation 166.3, 17 C.F.R. § 166.3 (2019), requires a Commission registrant such as an FCM to diligently supervise all activities of its officers, employees, and agents relating to its business as an FCM.  The term "Commission registrant" as used in 17 C.F.R. § 166.3 means "any person who is registered or required to be registered with the Commission

pursuant to the Act or any rule, regulation, or order thereunder" Regulation 166.1(a), 17 C.F.R. § 166.1(a) (2019).

33.     Regulation 42.2, 17 C.F.R. § 42.2 (2019) requires, among other things, that every FCM shall comply with the applicable provisions of the Bank Secrecy Act (BSA) and the regulations promulgated by the Department of the Treasury under that Act at 31 C.F.R. chapter X, and with the requirements of 31 U.S.C. § 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 C.F.R. § 1026.220, which require that a customer identification program ("CIP") be adopted as part of the firm's BSA compliance program.

34.     31 U.S.C. § 5318(l) (2018) requires, among other things, that financial institutions such as FCMs implement reasonable procedures to verify the identity of any person seeking to open an account, maintain records of information used to verify a person's identify, and consult lists of known or suspected terrorists or terrorist organizations (such as those created and distributed by the Office of Foreign Asset Control of the United States Department of Treasury ("OFAC") to determine whether a person seeking to open an account appears on any such list.

35.     The regulations promulgated by the Department of Treasury under 31 C.F.R. chapter X require, as relevant here, that every FCM must:  (1) implement a written CIP that, at a minimum, includes procedures for verifying the identify of each customer sufficient to enable the FCM to form a reasonable belief that it knows the true identify of each customer; (2) retain records collected pursuant to the CIP; and (3) implement procedures for determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations.

## V.    FACTS

### A.    The BitMEX Trading Platform and Products

36.    BitMEX is a peer-to-peer "crypto-products platform" that offers the trading of cryptocurrency derivatives including bitcoin, ether and litecoin.  As of September 5, 2020, BitMEX advertises that it has a transaction volume of $74.06 billion during the prior thirty days, and $956.83 billion during the past year.

37.    BitMEX offers leveraged trading of cryptocurrency derivatives to retail (non-ECP) and institutional customers in the U.S. and throughout the world through BitMEX's website, www.bitmex.com, the BitMEX mobile app, and by direct connection to its trading engine servers via the BitMEX application protocol interface ("API").  The API connection is generally used by more technologically sophisticated BitMEX customers.

38.    On its website, BitMEX advertises that "sign up takes less than 30 seconds," and that customers can "trade in minutes; deposits only require one confirmation."  BitMEX allows customers to open accounts with an anonymous email and password, and a deposit of bitcoin.  BitMEX does not collect any documents to verify the identity or location of the vast majority of its users.

39.    BitMEX is a pure derivatives exchange as opposed to a spot market for the purchase or sale of virtual currencies.  BitMEX allows customers to place buy or sell orders for its various cryptocurrency derivatives with leverage of up to 100 to 1, meaning a customer with $10,000 in his or her account may execute a trade with a notional value of $1,000,000.  BitMEX does not actually deliver the cryptocurrencies underlying the contracts it offers for trading on its platform.

40.     BitMEX offers the leveraged trading of cryptocurrency derivatives; BitMEX does not actually deliver the cryptocurrencies whose prices underlie the various contracts and transactions BitMEX offers.

41.     BitMEX accepts deposits to and allows withdrawals from the platform in bitcoin. BitMEX requires customers to deposit bitcoin to margin trading positions in its various contracts. BitMEX allows customers to place buy (long) and sell (short) orders in an electronic order book, and matches customer orders in what it calls its "trading engine."

42.     To keep positions open, BitMEX customers are required to hold a percentage of the value of their trading positions on the exchange as margin.  BitMEX describes "Initial Margin" as "the minimum amount of bitcoin you must deposit to open a position."  BitMEX describes "Maintenance Margin" as "the minimum amount of bitcoin you must hold to keep a position open."  If a customer's margin balance drops below the Maintenance Margin level, BitMEX takes over the customer's trading position, the position is liquidated, and the customer's maintenance margin is lost.  If BitMEX is able to liquidate the position at above what it calls the "bankruptcy" price, the funds are added to BitMEX's "Insurance Fund."  If BitMEX is unable to liquidate the position above the bankruptcy price, BitMEX uses funds from its Insurance Fund to make up the difference, or may close out positions of other traders on the exchange in what BitMEX calls an "Auto-Deleveraging event."

43.     BitMEX acts as the counterparty to certain transactions on its platform, such as through its internal "market-making" desk, or through the BitMEX "Liquidation Engine" that can assume a customer's position under certain circumstances.

44.     In general, BitMEX makes money by charging execution fees for trades made on the BitMEX platform.  BitMEX has made more than $1 billion in fees since its inception in 2014.

45.     Hayes, Delo, and Reed launched the BitMEX trading platform for live trading in November of 2014.  Initially, BitMEX offered only two futures contracts, the "XBT" and the "XBU," both of which were based on the value of a dollar against the value of a bitcoin.  Over time, BitMEX added various virtual currency derivatives contracts to its suite of products, including futures, options and swaps on bitcoin, litecoin and ether.

46.     On May 13, 2016, BitMEX launched its first swap product, a "perpetual bitcoin U.S. dollar leveraged swap product," which it has described generally as "the XBTUSD perpetual swap."  On its website, BitMEX has described its "Perpetual Contract" (or "perpetual swap contract") as "a product similar to a traditional Futures Contract in how it trades."  BitMEX claims its "XBTUSD" perpetual swap is "the most traded cryptocurrency product of all time."

47.     Between November 22, 2014 and February 9, 2020, BitMEX has had over 2.5 trillion contracts traded on its platform.  Most of that volume—more than two trillion contracts— has been in the XBTUSD swap.

48.     Despite its significant trading volume, the varied products offered for trading, and acting in a capacity requiring designation or registration as a DCM or SEF, BitMEX has not implemented rules or procedures to achieve compliance with the core principles required of DCMs or SEFs under the CEA and Regulations.  Among other critical issues, BitMEX has failed to implement rules or procedures sufficient to ensure that: the contracts it offers are not readily susceptible to manipulation; market participants are prevented from engaging in manipulation or disruptive trading; and market participants who engage in misconduct are subject to discipline.

49.     Contrary to requirements imposed on DCMs and SEFs, BitMEX has failed to maintain required records, and in fact has actively deleted required records including critical customer identification information.

50.     Further, BitMEX has failed to establish rules to minimize conflicts of interest. This is apparent because Hayes, Delo, Reed, and numerous other BitMEX employees trade on the platform, and BitMEX's own internal "market-making" desk has at times been one of the largest traders on the platform.

**B.     BitMEX's U.S. Operations and Offices**

51.     Throughout the Relevant Period, BitMEX has conducted major components of its business and maintained a significant presence in the U.S.

52.     During the Relevant Period, BitMEX has employed approximately half of its workforce in the U.S., including at least 9 in New York and 56 in San Francisco.

53.     BitMEX's U.S.-based employees' and agents' compensation is typically paid by ABS, a company controlled by Hayes, Delo, and Reed.  An April 27, 2017 Service Agreement between HDR and ABS renders ABS staff contractually responsible for BitMEX's business development, marketing, sales, engineering, human resources, payroll, customer support and software development from its U.S. offices in San Francisco and New York.

54.     BitMEX executives based outside of the U.S. frequently visit BitMEX's San Francisco offices.  Hayes and other BitMEX sales staff have frequently traveled to the U.S. to solicit customers for BitMEX and to publicly promote BitMEX in through U.S. media outlets.

55.     Since the BitMEX San Francisco office opened in 2017, at least the following functions have been performed from that office:  Product Engineering, Incident Response, and Software and Security Engineering, Product Management, User Experience/Visual Design/UX,

Dev Ops Engineering, Data Engineering, Kubernetes Engineering, Web Development, Human Resources, Ventures, Security and IT, Communications, Marketing, Accounting, and Recruiting.

56.     Beginning in 2014 and continuing through the Relevant Period, Reed has worked primarily from within the U.S.  Reed was the primary architect of BitMEX's website and order entry system.  Reed also has been responsible for BitMEX's information security management, along with a team based primarily in BitMEX's San Francisco office.  On March 1, 2018, BitMEX leased office space for ABS in Milwaukee, Wisconsin, where Reed performed work for BitMEX.

57.     BitMEX's Head of Business Development was based in New York for the majority of the Relevant Period.  This executive reported to, and continues to report to Hayes. While residing and acting on behalf of BitMEX in the U.S., specifically in this District, this executive has been responsible for leading BitMEX's Customer Support team, managing sales staff worldwide, leading institutional sales, speaking publicly about BitMEX, developing products for BitMEX, and leading BitMEX's internal "market making" desk that trades on the BitMEX platform.

58.     BitMEX continued to increase its New York presence in 2018, hiring a Marketing Manager in April 2018 to promote BitMEX, an Investment Associate in May 2018, an Art Director in July 2018, and a Content Manager to write strategic marketing communications, press releases, pitches, emails, and web content in October 2018.  Consistent with this increased presence, on May 1, 2018, a BitMEX executive signed an agreement for office space in New York.

59.     To respond to U.S. customer service issues and emails, BitMEX hired a Customer Service Representative in October 2017 to work remotely from New Jersey.

60.     BitMEX recently closed its New York office, but continues to run significant portions of its derivatives trading platform from San Francisco, and remotely from other parts of the U.S.

61.     BitMEX uses vendors based in the United States for critical components of its business, for example using Google products for email services, using Slack for an internal BitMEX communications platform, and Amazon Web Services for data storage and handling.

62.     BitMEX also uses the benefits and protections of the U.S. legal system.  For example, BitMEX has applied for various United States trademarks and service marks on the BitMEX name and logo.  On March 29, 2018, BitMEX applied with the United States Patent and Trademark Office for a trademark on the word "BitMEX."  The owner of record for the "BitMEX" U.S. Word Mark is HDR.

### C.   Hayes, Delo, and Reed Have Controlled BitMEX and Operated BitMEX as a Common Enterprise

63.     Throughout the Relevant Period, Hayes, Delo, and Reed have controlled the BitMEX common enterprise, including the various corporate entities that comprise BitMEX for the common purpose of operating the BitMEX trading facility.  Hayes, Delo, and Reed each sign documents on behalf of the various BitMEX corporate entities.  They control the bank and trading accounts for the various BitMEX corporate entities.  They have the authority to hire and fire employees.  And they ultimately control the deposits to and withdrawals from the BitMEX platform.

64.     Hayes, Delo, and Reed incorporated HDR as a Seychelles International Business Company on June 23, 2014.  They were the three original Directors of HDR, and each owned approximately one third of that entity.

65.     Hayes signed many of the initial corporate documents for HDR, agreeing in documents to act "as principal agent" of the entity, and representing that HDR would not "engage in any businesses which are considered to be illegal in Hong Kong or other countries in the world."

66.     Hayes, Delo, and Reed incorporated Shine in Hong Kong on August 6, 2014.  The first Director and Chairman of the company was Hayes.  Delo was later appointed as Chairman of Shine, and in that role approved the lease of office space in the Cheung Kong Centre in Hong Kong.

67.     Hayes, Delo, and Reed incorporated ABS in Delaware on April 27, 2017, at which time Hayes was "elected as the sole director of the Corporation."  In a corporate resolution on the same date, Hayes was appointed to be the President, Secretary and Treasurer of ABS, and given authority to open and manage bank accounts on behalf of ABS.  The same resolution "authorized and directed [ABS] to borrow funds from HDR Global Trading Limited."

68.     A November 2017 ABS corporate resolution authorized Hayes and Reed as "designated signatories," able to open bank accounts on behalf of ABS.  Hayes and Reed also have held credit cards for ABS.

69.     Hayes, Delo, and Reed have shared responsibility for various aspects of the BitMEX business.  At a high level, Delo has been responsible for building and overseeing the BitMEX trading engine, Reed has been responsible for building and overseeing the BitMEX website, API and order entry system, and Hayes has been responsible for strategic decisions, business development, marketing, and management of the BitMEX enterprise.  Hayes has also been primarily responsible for representing BitMEX in public speaking engagements and

appearances, and has authored many of the posts on the BitMEX blog.  Hayes regularly appears

as a speaker at conferences throughout the world, including in the U.S., on behalf of BitMEX.

70.     Hayes, Delo, and Reed have worked together to build the BitMEX platform, and

all have been involved in the critical decisions for the enterprise, such as whether (or not) to

pursue regulatory approval for the platform, or whether (or not) to implement KYC or AML

policies and procedures.  For example, in August 2014, shortly before the launch of the platform,

Hayes wrote to Delo that BitMEX would not do any KYC, saying "Basically just valid email

address until we feel significant pressure to do otherwise."

71.     Hayes, Delo, and Reed all were involved in discussions with compliance

consultants for BitMEX, even before the launch of the platform, and all three have participated

in discussions with BitMEX's numerous lawyers to discuss legal and regulatory issues facing

BitMEX.

72.     Hayes, Delo, and Reed have made decisions on BitMEX's products, including

deciding how to structure BitMEX's futures, options and swaps contracts.  Hayes, Delo, and

Reed also have been involved with developing and managing BitMEX's internal market maker

trading algorithms.

73.     The control by Hayes, Delo, and Reed continues today.  While BitMEX has hired

employees to manage certain aspects of trading facility, those individuals all ultimately act under

the direction and control of Hayes, Delo, and Reed.  Key financial and trading decisions require

"Founder" approval, meaning approval by Hayes, Delo, and Reed.

**D.     BitMEX Solicits US Customers**

74.     BitMEX has devoted significant resources to soliciting customers in the U.S.

BitMEX solicits orders from U.S.-based customers for futures, options, and swaps by advertising

on its website and on social media, including the BitMEX blog, Twitter, Reddit, Telegram,

Facebook, and a BitMEX YouTube page.  A 2015 BitMEX investor presentation prepared by Hayes stated that a "constant presence on these media platforms ensures that . . . [when the] Bitcoin community thinks of derivatives BitMEX comes to mind."  BitMEX also solicits customers and advertises in the U.S. at various conferences and at meetings with individual customers.

75.     BitMEX also solicits customers through its "affiliate" program.  BitMEX's affiliate program allows U.S. customers to solicit other customers to trade on the platform in exchange for compensation from BitMEX.  BitMEX provides customers with an affiliate link which they can share, for example as many BitMEX affiliate marketers do on Twitter, and receive compensation for customers who follow the link to open accounts and trade on the platform.

76.     Dozens of U.S. residents publicly identify themselves on social media as traders on the BitMEX platform, often also providing affiliate links encouraging social media followers to open accounts and trade on the BitMEX platform.  BitMEX is aware of this because BitMEX monitors social media platforms such as Twitter, Telegram and Reddit for references to BitMEX, for years pulling references to BitMEX customers who participated in BitMEX's affiliate program.

77.     In October of 2016, a senior BitMEX executive confirmed directly in response to a customer question that U.S. persons could solicit for BitMEX in connection with the affiliate program and be paid by BitMEX in bitcoin on the BitMEX platform, stating:  "It is fine for you to set up the account (while being located in the US) with us if you are not trading and only withdrawing the affiliate commissions . . . You do not need to do anything on your end to restrict them from your marketing, if they happen to sign up with a US IP and they are not US residents

then we will ask them to provide alternative verification. If they sign up from a non-US IP then no need to worry."

78.     As of July 27, 2018, at least 1,100 U.S. affiliate program customers received affiliate payments from BitMEX for soliciting customers to trade on BitMEX.  In 2019, BitMEX paid out $66 million to customers in affiliate commissions.

79.     Senior executives at BitMEX have openly acknowledged the solicitation of U.S. customers through the BitMEX affiliate marketing scheme, noting in internal chats that one user "openly tells Americans on Twitter and his website to use a VPN [a Virtual Private Network] to sign up for BitMEX" providing his BitMEX affiliate link and VPN link at the same time, having "pulled in around -43 XBT from the [affiliate] program."  Hayes was in direct contact with this specific affiliate marketer, handling BitMEX's relationship with the user and communicating with him about his BitMEX affiliate pay-outs.

80.     The use by U.S. customers of VPN services, which create a private network from a public internet connection and mask the customer's internet protocol (IP) address so online actions are virtually untraceable, to access and trade on the BitMEX platform, is an open secret. For example, YouTube contains videos of U.S. customers trading on BitMEX, along with instructions on how to access BitMEX from the U.S.  Messaging applications Discord and Telegram have chat groups that instruct U.S. residents to use a VPN to access BitMEX if trading from the U.S.  Internal documents including BitMEX customer service representative emails and chats reflect regular awareness of the use by U.S. persons of VPN services to access and trade on the BitMEX platform.

81.     In addition to soliciting U.S. retail customers, BitMEX has also marketed directly to proprietary trading firms and other institutional customers based in the U.S., has held meetings

in the U.S., and has solicited firms to open accounts to trade on BitMEX through off-shore entities.  Internal BitMEX emails note the need to focus on "business development and marketing" to institutional customers, with a dedicated employee for "US and European markets."

82.     In 2014, BitMEX solicited a proprietary trading firm headquartered in Chicago, Illinois to be the first "lead market maker" on the BitMEX platform.  Hayes, Delo, and Reed were all directly involved in communications with the firm's executives in Chicago.

83.     BitMEX staff frequently has met with U.S. traders.  For example, BitMEX executives traveled to Chicago in July 2018 to meet with at least seven major Chicago-based trading firms.  In addition, BitMEX executives also met with prominent proprietary trading firms in New York.

84.     Throughout the Relevant Period, BitMEX's U.S. customers have been able to access the BitMEX platform from the U.S.—either via API or through the BitMEX website accessed on their own computers located in the U.S. via a VPN.

**E.      BitMEX Fails To Implement Anti-Money Laundering and Know-Your-Customer Procedures, or a Customer Information Program.**

85.     Throughout the Relevant Period, BitMEX has failed to implement any KYC procedures or a CIP that would enable it to identify U.S. persons–or the true identity of the vast majority of its customers, whether from the U.S. or elsewhere.

86.     BitMEX has not implemented any AML policies or procedures, which are required of financial institutions such as FCMs to prevent or detect, among other things, terrorist financing or other criminal activity.

87.     BitMEX has no CIP, which, like KYC procedures, is required of certain financial institutions including FCMs.

88.     BitMEX has also "deleted" records for numerous accounts, in certain cases explicitly because a user was found to be located in the U.S. or another "restricted jurisdiction." In a December 2018 chat involving BitMEX Customer Support personnel, a BitMEX supervisor describes the policy:  "At the moment we are deleting people's accounts once they have withdrawn if they are from a restricted jurisdiction."

89.     Throughout the Relevant Period, Hayes, Delo, and Reed have been fully aware that U.S. customers have used VPN to access the BitMEX platform.  For example, Delo and Reed regularly received email notification indicating new U.S. customers were opening accounts on BitMEX, and its self-identified "thought leader" and "visionary" Hayes has also advised U.S. customers on how to trade on BitMEX, stating, "If you have a non-US company that can open an account with us, Greg our head of business development can assist."  BitMEX even maintained an internal dashboard of open accounts from supposedly restricted jurisdictions.

90.     Delo altered a U.S. resident's (and prominent BitMEX user) account location to Canada for a user that brought in 1,336 user accounts through BitMEX's affiliate program.

91.     Hayes, Delo, and Reed received or had access to spreadsheets and reports that showed the trading volume, revenue to BitMEX, and other account and transactional information for U.S. based traders.  For example, BitMEX country revenue reports from October 2018 contain information about the number of U.S traders on its platform.

92.     As late as November 3, 2018, still BitMEX did not "have any rules in place" with regard to U.S. customers.  Even after BitMEX began imposing some restrictions on access to the platform by U.S. traders, Hayes, Delo, and Reed crafted exceptions for certain U.S. traders and were aware that other U.S. traders accessed the platform by using VPN.  Further, BitMEX's lack

of any KYC procedures or a CIP made BitMEX's superficial steps to block U.S. traders

ineffective.

**F.**     **BitMEX Was Aware of U.S. Regulatory Requirements but Attempted to Evade Them**

93.     Hayes, Delo, and Reed were aware of the regulatory regime applicable to U.S.

financial institutions such as FCMs, but made conscious decisions throughout the Relevant

Period to avoid and evade them.

94.     For example, in a March 2015 investor presentation laying out BitMEX's

business plan, Hayes wrote that:

a.   BitMEX chose to incorporate HDR in the Seychelles because "FX exchanges do not

need to register for a financial services license if they conduct all of their business

offshore,"

b.   "Bitcoin derivatives are completely unregulated worldwide.  No government

regulator has come out with any definitive guidance.  Regulators are still trying to

tackle the exchanging of fiat and Bitcoin.  The fact that BitMEX is Bitcoin only and

does not touch and [sic] domestic fiat currency also helps shield the exchange from

regulations."

c.   "The CFTC is expected to deliver guidance on Bitcoin derivatives sometime in 2H

2015, BitMEX wants to be able to service the US market."  Attorneys for BitMEX

"will be advising BitMEX on how to tackle any regulation that the CFTC plans to

enact.  As it currently stands now the type of Bitcoin derivatives that BitMEX offers

can be traded by US persons."

d.   "BitMEX deals only in Bitcoin and does not transfer between two value stores.

From a regulatory standpoint, this means that BitMEX is not required to conduct

KYC or AML on any accounts.  Users can sign up with just a verified email address."

e.  "BitMEX recognizes that to attacht [sic] the deepest pools of liquidity obtaining a financial license in a well respected jurisdiction is a must.  AS trading volumes and revenues grow, BitMEX will be actively looking at favorable jurisdicts [sic] from which to become a regulated derivatives exchange.  New Zealand, Islae of Man, Jersey, and Gibraltar, are some of the jurisdicitons [sic] that BitMEX and its legal team are investigating."

95.    BitMEX's co-founders were aware of the need to know the identity of BitMEX customers throughout the Relevant Period.  Around the launch of the platform, Hayes, Delo, and Reed contacted a compliance consultant who told them in November of 2014 that:

> You need to know [who] you think you are dealing with is in fact who you are dealing with. Specifically, because of the nature of your business, you require this to be a global identity dataset. You need to ensure that you do not violate countless international statutory regulations which prohibit dealing with a variety of barred entities.

Nonetheless, Hayes, Delo, and Reed decided to ignore U.S. and other countries' regulations requiring BitMEX to verify the identity of its customers.

96.    In 2015, a potential business partner for BitMEX asked Hayes about BitMEX's "regulatory compliance landscape," asking "do you have any particular licenses or registrations in any jurisdictions to conduct your business?  Such as FinCEN, BitLicense or money transmitter licenses?  Do you do business in the US (ie do you accept customers resident in the US)?"  Hayes responded, "We do not have any licenses. We are incorporated in the Seychelles, and accept customers globally except for NY State."

97.     In a blog post in May of 2015, Hayes mocked the efforts of a competitor to comply with U.S. regulatory requirements.  Hayes wrote that this exchange "Kissed the Ring and can sort of offer their services throughout the US."  Hayes noted in the same blog post a different firm in the virtual currency industry on the "wrong side of the tracks," because it had "failed to adhere to the Bank Secrecy Act."

98.     In September of 2015, the CFTC charged and settled  two matters involving violations of the CEA by two firms involved in digital asset transactions, one of which was charged with illegally operating a facility for the trading or processing of bitcoin options and swaps without being registered with the CFTC as a DCM or SEF.  Hayes recognized that "this will have an impact on" BitMEX's business, and that one of BitMEX's goals is to "obtain legal clarity as to next steps as it regards to US Bitcoin regulations and the CFTC."

99.     Yet BitMEX's efforts to evade, rather than comply with, regulations in the U.S. continued well after 2015 and even to the present.  For example, throughout the Relevant Period BitMEX executives coached U.S.-based trading firms to incorporate off-shore entities in order to open trading accounts on BitMEX through those off-shore entities.  The notes of one BitMEX executive in 2018 reflect the rationale:  "We do not service US individuals or US entities given we do not have the required licenses that fall under CFTC regulations when offering derivative products.  As such, we cannot have clients based in the US with trading functions that could give a US regulator an argument to assert jurisdiction on."  Yet, the executives at the U.S. based firms courted and regularly communicated with regarding trading on the BitMEX platform were inevitably based in the U.S.

100.    In August of 2020, BitMEX finally announced plans to begin conducting KYC on customer accounts, supposedly to begin at some point in 2021.  But Hayes, Delo, and Reed made

deliberate decisions throughout the Relevant Period to refrain from implementing KYC and AML procedures, despite knowing other business partners and competitors were implementing such procedures.  For example, Hayes communicated with executives of other cryptocurrency exchanges about KYC obligations.  In fact, Hayes regularly filled out KYC forms for himself and BitMEX's various corporate entities at other exchanges and with BitMEX trading partners, often noting BitMEX's own decision not to implement any KYC or AML procedures.  For example on March 17, 2016, Hayes exchanged emails with a U.S.-based exchange in response to questions about BitMEX's policies:

> Apart from blocking US residents from using our platform we do no other KYC as we are not required to under Seychelles law for the products that we offer. For non US persons we require only a verified email address.

101.    At the time Hayes wrote that BitMEX was "blocking" U.S.-based users, thousands of U.S. persons were in fact trading on BitMEX's platform.

## VI.    <u>VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS</u>

### COUNT I

**Violations of Section 4(a) of the Act, 7 U.S.C. § 6(a) (2018), or, alternatively, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. 48.3 (2019)**

**Execution of Futures Transactions on an Unregistered Board of Trade**

102.    The allegations set forth in paragraphs 1 through 101 are re-alleged and incorporated herein by reference.

103.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6(a) by:

   a.   offering to enter into retail commodity transactions, or contracts for the purchase or sale of bitcoin, litecoin and ether for future delivery;

b.  entering into retail commodity transactions, or contracts for the purchase or sale of
bitcoin, litecoin and ether for future delivery;

c.  confirming the execution of retail commodity transactions, or contracts for the
purchase or sale of bitcoin, litecoin and ether for future delivery; and

d.  conducting an office or business in the U.S. for the purpose of soliciting, or
accepting any order for, or otherwise dealing in, any transaction in, or in connection
with, retail commodity transactions or contracts for the purchase or sale of bitcoin,
litecoin and ether for future delivery;

without conducting its futures transactions on or subject to the rules of a board of trade that was
designated or registered by the CFTC as a contract market.

104.    BitMEX's retail commodity transactions are and were offered, entered into or
executed on a leveraged or margined basis, or are and were financed by the offeror, the
counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

105.    BitMEX's retail commodity transactions are and were offered to, entered into or
executed with persons who are not eligible contract participants or eligible commercial entities
and who are not engaged in a line of business related to cryptocurrencies.

106.    In the alternative, during the Relevant Period, Defendants HDR, 100x, ABS,
Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and
through their officers, employees, and agents, violated and are continuing to violate
7 U.S.C. § 6(b) and Commission Regulation 48.3, 17 C.F.R. § 48.3 (2019), by permitting direct
access to its electronic trading and order matching system without obtaining an Order of
Registration for a foreign board of trade from the Commission.

107.    Each offer to enter into, execution of, and/or confirmation of the execution of illegal off exchange futures transactions, including, without limitation, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a) or, alternatively, 7 U.S.C. § 6(b) and 17 C.F.R. § 48.3.

108.    During the Relevant Period, Hayes, Reed and Delo directly or indirectly controlled BitMEX, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations described in this Count. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Hayes, Reed and Delo are therefore liable for BitMEX's violations described in this Count to the same extent as BitMEX.

109.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX.

## COUNT II

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019)**

**Illegal Off-Exchange Commodity Options**

110.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

111.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated 7 U.S.C. § 6c(b) and Regulation 32.2 by offering to

enter into, entering into, confirming the execution of, maintaining positions in, and otherwise conducting activities relating to commodity option transactions in interstate commerce.

112.    The commodity options that BitMEX offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered board of trade, nor has BitMEX sought registration as an exempt foreign board of trade.

113.    Each act in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

114.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

115.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

## COUNT III

### Violation of Section 4d of the Act, 7 U.S.C. § 6d (2018)

### Failure to Register as a Futures Commission Merchant

116.     Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

117.     During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, have operated as a Futures Commission Merchant, and are continuing to operate as a Futures Commission Merchant, by:

    a.    engaging in soliciting or accepting orders for the purchase or sale commodities for future delivery;

    b.   engaging in soliciting or accepting orders for swaps;

    c.   engaging in soliciting or accepting orders for agreements, contracts or transactions described in section 2(c)(2)(D)(i) of the Act (retail commodity transactions); and/or

    d.   acting as a counterparty in agreements, contracts, or transactions described in section 2(C)(2)(D)(i);

and, in or in connection with these activities, accepting money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the BitMEX platform.

118.     During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6d by failing to register with the Commission as a Futures Commission Merchant.

119.     Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

120.     Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 6d.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 6d.

121.     The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 6d.

## COUNT IV

**Violations of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019)**

**Failure to Register as a Designated Contract Market or Swap Execution Facility**

122.     Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

123.     During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3(a)(1) by operating a facility for the trading of swaps on digital assets including bitcoin, ether, and litecoin without registering with the CFTC as a DCM or a SEF.

124.    BitMEX has operated and is continuing to operate a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform, including the trading or processing of swap on digital assets including bitcoin, ether, and litcoin, without being registered as a DCM or SEF.

125.    Certain products that have traded on BitMEX, including "perpetual swaps" or "perpetual contracts" on bitcoin, ether, and litecoin, are swaps as defined by 7 U.S.C. § 1a(47).

126.    Each act in violation of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

127.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

128.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

## COUNT V

### Violations of Regulation 166.3, 17 C.F.R. § 166.3 (2019)

### Failure to Supervise

129.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

130.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 166.3 by employing an inadequate supervisory system and failing to perform its supervisory duties diligently.  More specifically, BitMEX violated and is continuing to violate 17 C.F.R. § 166.3 by, among other things, failing to implement a Customer Information Program, failing to implement and conduct Know-Your-Customer procedures, failing to implement Anti-Money Laundering procedures, and by failing to ensure that its partners, officers, employees, and agents, lawfully and appropriately handled all commodity interest accounts at BitMEX.

131.    BitMEX is and has been acting as an FCM, and therefore 17 C.F.R. § 166.3 applies to BitMEX, as if it were a Commission registrant.

132.    Each act in violation of 17 C.F.R. § 166.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

133.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's violations of 17 C.F.R. § 166.3.  Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 17 C.F.R. § 166.3.

134.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 17 C.F.R. § 166.3.

## COUNT VI

### Violations of Regulation 42.2, 17 C.F.R. § 42.2 (2019)

### Failure to Implement Customer Information Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures

135.    Paragraphs 1 through 101 of this Complaint are re-alleged and incorporated herein by reference.

136.    During the Relevant Period, Defendants HDR, 100x, ABS, Shine, and HDR Services, all acting as a common enterprise and doing business as BitMEX, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 42.2 by failing to implement a Customer Information Program, failing to implement Know-Your-Customer policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

137.    Each act in violation of 17 C.F.R. § 42.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

138.    Hayes, Reed and Delo directly or indirectly controlled BitMEX and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting BitMEX's

violations of 17 C.F.R. § 42.2. Therefore, pursuant to 7 U.S.C. § 13c(b), Hayes, Reed and Delo are liable as a controlling person for each of BitMEX's violations of 17 C.F.R. § 42.2.

139.    The acts and omissions of Hayes, Reed, Delo, and other officers, employees, or agents acting for BitMEX described in this Complaint were done within the scope of their office, employment, or agency with BitMEX. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, BitMEX is liable as a principal for each act, omission, or failure of the other officers, employees, or agents persons acting for BitMEX, constituting violations of 17 C.F.R. § 42.2.

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendants 100x, HDR, ABS, Shine, and HDR Services, collectively doing business as BitMEX, and through their officers, employees, and agents, including without limitation Hayes, Delo, and Reed, violated Section 4(a) of the Act, 7 U.S.C. § 6(a) (2018) (or, in the alternative, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. 48.3 (2019)); Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019); Section 4d of the Act, 7 U.S.C. § 6d (2018); Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1) (2018), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2019); Regulation 166.3, 17 C.F.R. § 166.3 (2019); and Regulation 42.2, 17 C.F.R. § 42.2 (2019).

B.    An order of permanent injunction prohibiting Defendants and any other person or entity associated with them, from engaging in conduct described above, in violation of 7 U.S.C. §§ 6, 6c(b), 6d, and 7b-3(1), and 17 C.F.R. §§ 32.2, 37.3(a)(1), 42.2, 48.3 and 166.3.

C.    An order of permanent injunction prohibiting Defendants and any of their affiliates,

agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

(i)      trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la(40) (2018));

(ii)     entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

(iii)    having any commodity interests traded on Defendants' behalf;

(iv)     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(v)      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(vi)     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019);

(vii)     acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.    An order directing Defendants and any third party transferee and/or successors

thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.     An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with , or amount Defendants and any customer or investor whose funds were received by Defendants a result of the acts and practices that constituted violations of the Act, as described herein;

F.     An order requiring Defendants to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G.     An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act, as described herein;

H.     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

I.    Such other and further relief as the Court deems proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Dated:  October 1 , 2020                 Respectfully submitted,

Commodity Futures Trading Commission
By its attorneys:

*/s/ Carlin Metzger*

Carlin Metzger (*Pro Hac Vice Pending*)
Senior Trial Attorney
*cmetzger@cftc.gov*
312-596-0536

Brigitte Weyls (*Pro Hac Vice Pending*)
Senior Trial Attorney
*bweyls@cftc.gov*

Joseph Platt (*Pro Hac Vice Pending*)
Trial Attorney
*jplatt@cftc.gov*

Elizabeth N. Pendleton (*Pro Hac Vice Pending*)
Chief Trial Attorney
*ependleton@cftc.gov*

Scott R. Williamson (*Pro Hac Vice Pending*)
Deputy Regional Counsel
*swilliamson@cftc.gov*

Robert T. Howell
Deputy Director
*rhowell@cftc.gov*

Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0700
(312) 596-0714 (fax)
*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*